# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs December 1, 2015

## STATE OF TENNESSEE v. MARK BRIAN DOBSON aka MARK B. MARTIN

### Appeal from the Criminal Court for Davidson County
### No. 2013-C-2464    Mark J. Fishburn, Judge

---

### No. M2015-00818-CCA-R3-CD – Filed December 13, 2016

---

A Davidson County Criminal Court Jury convicted the Appellant, Mark Brian Dobson, of five counts of especially aggravated kidnapping, one count of aggravated burglary, and one count of employing a firearm during the commission of a dangerous felony. After a sentencing hearing, he received an effective seventy-year sentence. On appeal, the Appellant contends that (1) the evidence is insufficient to support the convictions, (2) the trial court improperly denied his motion for a continuance, (3) the trial court erred by admitting into evidence a recorded telephone call in which his mother mentioned a stolen firearm, (4) the indictment for the charge of employing a firearm during the commission of a dangerous felony was defective for failing to name the underlying dangerous felony, (5) the trial court improperly instructed the jury on employing a firearm during the commission of a dangerous felony, and (6) his effective sentence is excessive. Based upon the record and the parties' briefs, we conclude that the Appellant's sentence for employing a firearm during the commission of a dangerous felony in count eleven must be modified and remand the case to the trial court for correction of that judgment and to correct a clerical error on the judgment for count twelve. The judgments of the trial court are affirmed in all other respects.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed as Modified, Case Remanded

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

David M. Hopkins (on appeal), Murfreesboro, Tennessee, and Newton Holiday and Shawn Caster (at trial), Nashville, Tennessee, for the appellant, Mark Brian Dobson.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn R. Funk, District Attorney General; and Sarah Davis, Sara Beth Meyers, and Jan Norman, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual Background

In July 2013, the Davidson County Grand Jury indicted the Appellant for the especially aggravated kidnapping with a deadly weapon of Laquitta Waters; four counts of especially aggravated kidnapping with a deadly weapon of Waters' four children, K.W., A.G., M.M., and M.W.; the aggravated burglary of Waters' home; employing a firearm during the commission of a dangerous felony; the domestic assault of K.W.; and the domestic assault of Waters. The indictment alleged that the domestic assault of Waters occurred on July 23, 2011, but that the remaining counts occurred on July 22, 2011. Before trial, the Appellant pled guilty to the domestic assault of Waters, a Class A misdemeanor.

At trial on the remaining eight counts, Waters testified that she was thirty-four years old and had four children: two sons, K.W. and M.W., and two daughters, A.G. and M.M. Waters and the Appellant had been dating "off and on" for four years at the time of the alleged offenses, and M.M. and M.W. were the Appellant's children. The Appellant sometimes stayed at Waters' home and was sometimes violent with her. Waters said she previously had warrants issued for his arrest but did not pursue the charges because "I was just in love and just didn't come down here to show up at the time."

Waters testified that in late June or early July 2011, she and her children moved into an apartment on Lemont Drive. Waters' name was on the lease, she paid the rent, and she did not give the Appellant a key. The apartment had three bedrooms. K.W., who was eleven years old, slept in the first bedroom, and A.G. and M.M., who were nine and five years old, respectively, shared the second bedroom. Waters said that her bedroom was "the last room with the balcony in the back" but that she and M.W., who was just a couple of weeks old, slept in the second bedroom with A.G. and M.M. Waters and the Appellant were not "together" at that time, but Waters would see him when she took the children to his mother's house.

Waters testified that in the early morning hours of July 22, she and the four children were sleeping in the second bedroom. Waters and M.W. were in one twin bed, A.G. and M.M. were in a second twin bed, and K.W. was on the floor. Waters said that "the light come on" and that the Appellant came into the bedroom. The Appellant had a

gun, put it to Waters' head, and accused her of trying to sell sex on Facebook. Waters said that she asked the Appellant what he was talking about and that he "kept going on and on about 'log on Facebook,' and, you know, waving a gun around walking back and forth right there . . . in between the beds and stuff." Waters got out of bed and told the Appellant to leave. K.W. started to leave the bedroom, but the Appellant pushed K.W., causing the boy to hit his knee on the end of the bed.

Waters testified that the Appellant refused to leave, went into the living room, and pushed the couch in front of the apartment door. The Appellant told Waters, "[A]in't nobody going nowhere.'" He then moved M.M. into the living room, lay on the couch, and put the gun beneath a pillow under his head. Waters and the three other children remained in the bedroom. Waters said that she could not go back to sleep and that the Appellant checked on her several times during the night to make sure she was not trying to help the children escape.

Waters testified that she had locked the door to her apartment prior to the incident and that she did not know how the Appellant got inside the apartment. The Appellant took Waters' cellular telephone and car keys, and she was scared. She said the Appellant's gun was a black pistol and was "shaped like" a police officer's gun. Waters explained that she did not try to escape from the apartment because she was afraid the Appellant would hear her and hurt her and the children. At daylight, Waters lied to the Appellant by telling him that one of the children had an appointment at Centerstone, a community mental health care center. Waters also told the Appellant that the police would come to the apartment if Waters did not "show up" for the appointment. The Appellant allowed the children to get dressed, everyone got into Waters' car, and Waters drove to Centerstone.

Waters testified that she and the children went into Centerstone while the Appellant waited in the car. Waters told a woman at the front desk about the Appellant and told her to call the police. Five or ten minutes later, the Appellant came into Centerstone, and the woman at the desk told him to leave. Centerstone employees took Waters and the children into a secure area to wait for the police. The Appellant left before the police arrived, and Waters did not see him again that day.

Waters testified that the following night, July 23, she was at a friend's house. She said she was sitting outside "listening to some music, drinking and dancing and stuff" and saw the Appellant running on the sidewalk toward her. Waters ran around her car, and the Appellant "leaped" over the hood and grabbed her. She said he "slung" her onto the ground, "stomp[ed]" on her face, and ran away. Waters flagged down a police officer and told him what had happened. She said she had a "busted" blood vessel in her eye and a "busted" lip, and she identified photographs of her injuries for the jury. During the next

month, the Appellant continued to contact Waters. On August 29, the Appellant demanded to see M.W. Waters let the Appellant into her apartment to see the baby, but he refused to leave. The next day, Waters made up an excuse to leave the apartment and telephoned the police. The police came to the apartment and arrested the Appellant. After the arrest, the Appellant continued to contact Waters. The Appellant telephoned her from jail, and she accepted his calls. She said that she told him to stop calling but that he continued to do so. Waters finally stopped accepting the Appellant's calls in 2012.

Waters testified that the Appellant sent her letters from jail, and she identified letters written by him for the jury. In a letter dated October 19, 2011, the Appellant apologized to Waters for "fighting on" her and asked that she forgive him for "all the wrong and pain" he had caused. In a letter dated October 20, 2011, the Appellant threatened to harm "that [N***a] you with." In a letter dated December 9, 2011, the Appellant stated that he would not allow Waters to be with another man and threatened to kill "that [n***er] before I let him have my soulmate." Waters said she was afraid the Appellant would kill her too.

On cross-examination, Waters testified that the door of her apartment was not broken, and no windows were damaged. The door was dead-bolted on the night of July 22 and could only be opened from the inside by turning the lock or from the outside with a key. K.W. did not see a doctor for the injury to his knee, and Waters did not photograph the injury. Waters acknowledged that she was drinking alcohol on the night of July 23 and that she did not try to run into anyone's house to get away from the Appellant.

Waters acknowledged that she spoke with Detective Jason Osborne on the telephone on August 1, 2011, that he asked if she knew the Appellant's whereabouts, and that she told the officer no. She denied that the Appellant was "standing right there" during her conversation with the officer. Sometime after the incident on July 22 but prior to the Appellant's arrest, Waters took the children swimming at a Red Roof Inn. The Appellant was also present. A warrant had been issued for the Appellant's arrest, but Waters did not telephone the police. She denied that the Appellant accompanied her to a pediatric appointment for M.W. when M.W. was two months old.

Waters acknowledged that a warrant had been issued for the Appellant's arrest when she let him into the apartment on August 29. She also acknowledged that the police did not find a gun on his person or in her apartment when they arrested him on August 30. Waters denied giving the Appellant money or sending him cards while he was in jail. She identified an envelope, addressed to the Appellant and with her return address, containing photographs of her children. Waters acknowledged taking the

photographs but denied mailing them to the Appellant, stating that his mother may have sent them.

Waters testified that the Appellant was present for the births of his children and that he signed M.M.'s birth certificate; however, he did not sign M.W.'s certificate. The Appellant questioned M.W.'s paternity, so a DNA test was performed after the Appellant's arrest. The test showed that the Appellant was M.W.'s father.

On redirect examination, Waters acknowledged that she called 911 on July 25 and July 28, 2011, trying to have the Appellant arrested. On recross-examination, she acknowledged that every time she telephoned the police, she told them the Appellant had a gun. However, the police did not find a firearm related to this case.

Thirteen-year-old K.W. testified that in July 2011, he was living with his mother, brother, and sisters on Lemont Drive and that the Appellant did not live with them. One night, K.W. was asleep in his bedroom but heard a commotion in his sisters' bedroom. K.W. said that he went into the room, that the Appellant "was like 'log into Facebook, log into Facebook right now,'" and that the Appellant was pointing a gun at Waters' head. The gun was black and looked like a pistol. K.W. said that he did not know how the Appellant got into the apartment but that "I think the window [was] broke in.'"

K.W. testified that he was scared and that he was "trying to go over there." However, the Appellant pushed K.W. K.W. hit his ankle on the bed rail and started crying. Waters asked the Appellant what he was talking about, but the Appellant went into the living room and moved the couch in front of the door. At some point, the Appellant told M.M. "to go lay down back where he was." During the night, the Appellant checked the bedroom to make sure Waters and the other children were not trying to get out of the apartment.

K.W. testified that the next morning, his mother drove everyone to Centerstone. Waters and the children went inside, and Waters told someone at the front desk that "he got a gun, help us." K.W. said the Appellant came in "like two minutes behind us." The Appellant claimed that Waters was crazy and that he did not have a gun. A woman took Waters and the children to a back room, and the Appellant "went off somewhere."

On cross-examination, K.W. acknowledged that the Appellant helped the family move into the apartment on Lemont Drive. On the night of the altercation in the bedroom, K.W. heard Waters and the Appellant yelling. K.W. went to the bedroom and saw that the light was on. Waters was lying in bed, and the Appellant was standing near her. K.W. said that he "tried to stop it" and that the Appellant pushed him. K.W.'s ankle

hit the bed and was hurting but was not swollen or bruised. During the drive to Centerstone, K.W. did not see the Appellant with a gun.

Julie Magin testified that on July 22, 2011, she was working at the front desk at Centerstone. An African-American woman with children came inside and said that a man was trying to kill her. The woman was "panicked" and told Magin to call 911. Magin said that she telephoned the police and that Centerstone staff moved the woman and children "behind locked doors." Shortly thereafter, an African-American man came into the facility. He did not say anything to Magin but lifted his hands and the front of his shirt to show that he did not have any weapons. Magin did not tell the man to leave, but he left the building immediately.

Melaton Bass-Shelton testified that she was the Clinic Manager for Centerstone. On July 22, 2011, a woman came into the facility and "made a statement that she was in fear for her life." The woman was "in a panicked state" and said that a man had held her at gunpoint. Bass-Shelton moved the woman and the woman's children to the other end of the building and had staff call 911. The police arrived and looked for the man but could not find him.

Officer Terry Richards of the Metropolitan Nashville Police Department (MNPD) testified that on July 22, 2011, she responded to a call involving a weapon at Centerstone. When she arrived, she interviewed Waters, and Waters told her the following: The Appellant broke into Waters' home; held a gun to her head; and shoved her son to the floor, injuring his knee. The Appellant then barricaded the door with a couch so that Waters and her children could not leave. Waters later lied to the Appellant about having an appointment at Centerstone, and the Appellant rode with them to the appointment. During the drive, the Appellant held a gun to Waters' head and told her, "'I ought to kill you right now.'" When they arrived at Centerstone, Waters and the children went inside, and Waters asked the staff to call the police. The police arrived and looked for the Appellant but could not find him.

Johnetta Gordon testified that she was Waters' cousin. She did not know the Appellant but "[knew] of" him. On July 23, 2011, Gordon and Waters were at a cookout and were outside "listening to music, having a good time." Suddenly, Gordon saw the Appellant "run out on [her] right side" and jump over the hood of a car. The Appellant knocked Waters down and asked Gordon, "What [you] got to do with it[?]" Gordon felt threatened and answered, "[N]othing." She ran onto her aunt's porch. On cross-examination, Gordon acknowledged that she had a prior conviction for shoplifting.

Detective Clarence Thompson of the MNPD testified that on July 22, 2011, he interviewed Waters at the police department's Domestic Violence Division and that she

told him the following:  Waters woke to find the Appellant standing over her with a gun, and he told her, "'I should kill you now.'"  Waters gathered her children, and they all went into one room.  The Appellant put a couch or loveseat in front of the door and held Waters at gunpoint all night.  That next morning, Waters told the Appellant that one of the children had an appointment at Centerstone, so the Appellant went with Waters and the children to the facility.  During the drive, the Appellant pointed the gun at her and told her, "'I should kill you in front of your kids.'"  When they arrived at Centerstone, Waters and the children went inside, and Waters asked a woman to telephone the police.  Waters turned around and saw the Appellant enter the building.  The staff ushered Waters and the children into a secured area, and the Appellant left.

Detective Thompson testified that he tried to talk with K.W. but that the boy was "really quiet and withdrawn" and would not give him any information.  K.W. did say that the Appellant pushed him and that K.W. hit his leg on a bed frame.  Waters did not know how the Appellant gained entry to her apartment, and Detective Thompson did not go to the home because there was no evidence to collect.  Officers went to the Appellant's mother's house to arrest him but were told he did not live there. As part of Detective Thompson's investigation, he reviewed all of the previous reports Waters had filed against the Appellant.  Detective Thompson said that prior to this case, he had spoken with Waters three or four times.

On cross-examination, Detective Thompson acknowledged that he had spoken with Waters about the Appellant previously.  Defense counsel asked, "Did she usually say that Mr. Martin had a gun?"  Detective Thompson answered, "Yes, she said that he was known to carry a gun."  However, the officer never found a gun on the Appellant's person.

Thomas Devan Franklin, III, of the Davidson County Sheriff's Office (DCSO) testified that he was the custodian of records for telephone calls made by inmates at the Davidson County Jail.  Franklin identified eight recorded calls made by the Appellant, and the State played the calls for the jury.  The Appellant made the first and third calls to his mother, and the remaining calls were to Waters.  During the first call on September 6, 2011, the Appellant's mother asked him, "You knew this was going to happen. . . . What you expect with a stolen gun and all that, Mark?"  The Appellant told his mother that "I didn't kidnap them," and his mother replied, "You didn't let them go neither, did you?"  During the call, the Appellant asked his mother to place a three-way call to Waters.  At first, the Appellant's mother refused; however, she ultimately called Waters for him.  When Waters answered the telephone, the Appellant asked her, "You really want to see me do fifteen years?"  Waters said she could not talk to the Appellant and hung up.

During the second call on September 23, 2011, Waters asked the Appellant why he kept calling her. The Appellant told Waters that he knew he "[f***ed] up" and "traumatized" her and that he was "so sorry." Waters told the Appellant that she was glad to have her life back. In the third call on October 2, 2011, the Appellant's mother told him, "You ain't whooped nobody like you whooped [Waters]." In the fourth call on November 2, 2011, the Appellant told Waters, "I wish I would have never put my hands on you like that." During the fifth call on November 5, 2011, Waters told the Appellant that he moved the couch in front of the door, and the Appellant told her that he did not remember doing so. He also told her that he loved and missed her. In the sixth call on November 11, 2011, the Appellant again told Waters that he loved her. In the seventh call on December 17, 2011, Waters told the Appellant that she was happy because she did not have to worry about him "running up on [her] in the street." In the final call on December 30, 2011, Waters told the Appellant to stop calling her and hung up.

Franklin testified that in the six months prior to trial, the Appellant had called Waters's telephone number twenty-five to thirty times. However, none of the calls were answered.

After Franklin's testimony, the State rested its case-in-chief. Tom Davis of the DCSO testified that he was the records custodian for visitors to the jail. According to the Appellant's records, Waters was scheduled to visit him twenty-six times between September 12, 2011, and September 15, 2012. On cross-examination, Davis testified that the records showed Waters actually visited the Appellant only twice: on October 31, 2011, and November 5, 2011. On redirect examination, Davis testified that the records indicated Waters came to the jail to visit the Appellant ten additional times but that she was not "let in" to see him.

Jerrick Prime, the Appellant's cousin, testified that he helped the Appellant move Waters into the apartment on Lemont Drive. The items Prime moved to the new apartment included the Appellant's belongings. The Appellant had a key to the new apartment, and Waters did not appear to be afraid of him. The Appellant cleaned the old apartment so that the $700 security deposit would be returned to him.

On cross-examination, Prime testified that when the Appellant had money, "all was good." However, when the Appellant did not have any money, Waters would "send him to jail." Prime stated that he did not look into any of the boxes or bags he moved to the new apartment and that "I know he had his stuff in there, but I don't know what was his and what was hers." He acknowledged that he was not present during the incidents on July 22 or 23.

The jury convicted the Appellant as charged of especially aggravated kidnapping with a deadly weapon of Waters, K.W., A.G., M.M., and M.W., Class A felonies; aggravated burglary, a Class C felony; and employing a firearm during the commission of a dangerous felony, a Class C felony. The jury found the Appellant not guilty of the domestic assault of K.W.

## A. Insufficient Evidence

The Appellant claims that the evidence is insufficient to support his convictions of especially aggravated kidnapping and employing a firearm during the commission of a dangerous felony because no deadly weapon was recovered; he did not substantially interfere with the liberty of any of the alleged victims; and he could not kidnap his own children, M.M. and M.W. He also contends that the evidence is insufficient to support his aggravated burglary conviction because he lived at the apartment and had a key to it. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v.

Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

As charged in this case, especially aggravated kidnapping is defined as false imprisonment accomplished with a deadly weapon. Tenn. Code Ann. § 39-13-305(a)(1). False imprisonment is committed when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a). A removal or confinement is "[u]nlawful" if it is "accomplished by force, threat or fraud, or, in the case of a person who is under the age of thirteen (13) or incompetent, accomplished without the consent of a parent, guardian or other person responsible for the general supervision of the minor's or incompetent's welfare." See Tenn. Code Ann. § 39-13-301(15).

To sustain a conviction for aggravated burglary, the State must prove that the Appellant entered a habitation with intent to commit a felony, theft, or assault. Tenn. Code Ann. § 39-14-402(a)(1), -403(a). Here, the indictment alleged that the Appellant intended to commit assault. As instructed to the jury, the Appellant committed assault if he intentionally or knowingly caused Waters to reasonably fear imminent bodily injury. See Tenn. Code Ann. § 39-13-101(a)(2).

Taken in the light most favorable to the State, the evidence shows that the Appellant entered Waters' apartment in the early morning hours of July 22, 2011, and that he went into the second bedroom where Waters and her children were sleeping. The Appellant turned on the light, pointed a gun at Waters' head, and accused her of trying to sell sex on Facebook. He then went into the living room, pushed a couch in front of the door, and told Waters that no one was going to leave the apartment. Waters, K.W., A.G., and M.W. remained in the second bedroom while the Appellant took M.M. into the living room with him. During the night, the Appellant repeatedly returned to the bedroom to make sure Waters and the children were not escaping. The next morning, Waters lied to the Appellant by telling him that she was expected to take one of the children to an appointment at Centerstone and that the police would come to the apartment if she did not keep the appointment. The Appellant allowed everyone to get dressed, rode with Waters and the children to Centerstone, and remained in the car while everyone else went inside. As soon as Waters entered the facility, she told Julie Magin what had happened and asked Magin to telephone the police.

Although the Appellant contends that the evidence fails to show that he had a gun and shows that he lived in the apartment, the jury obviously accredited Waters' testimony that the Appellant threatened her with a gun and did not live in the apartment on July 22, 2011. Credibility determinations are made by the jury, not this court.

As to the Appellant's claim that he could not kidnap his own children, M.M. and M.W., we note that the Appellant has failed to cite any case law in support of his argument and that the State does not address the issue. See Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). That said, our supreme court has held that a minor child's father "is not subject to prosecution for especially aggravated kidnapping [of a child less than thirteen years old under Tennessee Code Annotated section 39-13-305(a)(2)] in the absence of an allegation that the minor child was removed or confined by force, threat, or fraud." State v. Goodman, 90 S.W.3d 557, 565 (Tenn. 2002) (emphasis added). In this case, though, the State indicted the Appellant for especially aggravated kidnapping accomplished with a deadly weapon under Tennessee Code Annotated section 39-13-305(a)(1), and the trial court instructed the jury that the confinements were "unlawful" if they were accomplished by force, threat, or fraud. Moreover, the Appellant's use of a gun to confine the children with him in the apartment placed all of the children in great danger and was exactly the type of conduct the kidnapping statute was intended to prohibit. See State v. Herbert B. Ward, No. E2011-02020-CCA-R3-CD, 2014 WL 200992, at *11-12 (Tenn. Crim. App. at Knoxville, Jan. 17, 2014) (noting that while no Tennessee case has addressed the issue of whether a parent may be prosecuted for kidnapping by use of force, the issue may rest on whether a defendant's conduct "constituted force that was 'unlawful' as contemplated by the false imprisonment and kidnapping statutes"), perm. to appeal denied, (Tenn. June 23, 2014). Thus, we conclude that the evidence is sufficient to support the Appellant's convictions for the especially aggravated kidnappings of M.M. and M.W.

## B. Motion for Continuance

Next, the Appellant contends that the trial court erred by denying his motion for a continuance. The State argues that the trial court properly denied the motion. We agree with the State.

The Appellant's trial started on March 24, 2014. Just prior to voir dire, lead defense counsel made an oral motion to continue the trial, advising the trial court that counsel was not ready. The court asked why, and lead counsel stated that he was "falling on the sword" and requesting a continuance due to scheduling and co-counsel's health problems. Lead counsel also stated that the case was "a little more complicated than [he] had anticipated it was going to be" and that he "couldn't get any witnesses subpoenaed because nobody was here last week." The State responded that the trial originally was set for September 2013, was rescheduled so that the Appellant could obtain new counsel, and was then rescheduled a second time in order for current counsel "to get caught up on the case." The State advised the court that the victim and her child were present and that "we are ready to go." Lead counsel argued that he needed a continuance in order to call a physician to testify that the Appellant accompanied Waters to a pediatric appointment

while a warrant was pending for the Appellant's arrest. Lead counsel said he also wanted to call Jerrick Prime and Shirlite Martin as witnesses. The trial court noted that current counsel was appointed to represent the Appellant in October 2013 and that testimony would not begin until the following day. The trial court stated that the defense counsel "can have until tomorrow to get their witnesses in."

It is well-established that the decision whether to grant a continuance rests within the sound discretion of the trial court. See State v. Mann, 959 S.W.2d 503, 524 (Tenn. 1997). The trial court's decision may only be reversed if the trial court abused its discretion and the appellant was improperly prejudiced. See State v. Morgan, 825 S.W.2d 113, 117 (Tenn. Crim. App. 1991). An appellant is improperly prejudiced by the denial of a motion for continuance when "a different result might reasonably have been reached if the continuance had been granted." Id.

On appeal, the Appellant contends that he was prejudiced by the denial of his motion for a continuance because Dr. Mary Atubra would have impeached Waters' testimony that the Appellant did not go with Waters to M.W.'s pediatric appointment and would have bolstered defense witness testimony about a lack of violence between the Appellant and Waters. However, as noted by the State, Dr. Atubra did not testify at the motion for new trial hearing, which occurred thirteen months after the Appellant's trial. Moreover, the defense was able to establish, without Dr. Atubra's testimony, that Waters willingly continued to have contact with the Appellant after the incidents on July 22 and 23, 2011. Thus, the Appellant has failed to show that he was prejudiced by the trial court's refusal to grant a continuance in order for him to have the physician testify at trial. See Tenn. R. App. P. 36(b).

C. Recorded Telephone Calls

The Appellant contends that the trial court erred by allowing the State to play his jailhouse telephone calls for the jury, "specifically as they related to his June 2011 arrest where a gun was recovered from him." He claims that his mother's statement about the stolen gun was irrelevant, was inadmissible pursuant to Tennessee Rule of Evidence 404(b), and was used to support Waters' testimony that he had a gun on July 22. The State argues that the trial court properly overruled the Appellant's objection to the calls. We conclude that the trial court erred but that the error was harmless.

The record reflects that in addition to indicting the Appellant for the nine offenses committed on July 22 and 23, 2011, the grand jury indicted him for two counts of domestic assault committed against Waters and K.W. on June 18, 2011. However, those two counts were severed from the remaining counts before trial.

During Waters' cross-examination testimony in the present case, defense counsel asked, "Ms. Waters, it seems like to me every time you called the police you claim[ed] [the Appellant] had a gun of some type, would that be a fair statement, ma'am?" Waters said yes, and defense counsel asked, "But no gun has ever . . . been produced, correct?" At that point, the State objected and advised the trial court at the bench that the police "found a gun in the house when they came [on June 18.]" The trial court asked the parties if a weapon was ever located after July 22. Defense counsel said no and that "[the State] knows this . . . stolen gun was found in June." The State did not dispute defense counsel's assertion and stated, "I'm just trying to make sure we don't get into it."

During Thomas Franklin's testimony, he identified a recording of eight jailhouse telephone calls made by the Appellant to the Appellant's mother or Waters, and defense counsel requested a bench conference. At the bench, defense counsel advised the trial court that "there's a discussion with his mother about a gun that was taken on [June 18], and I think that would be highly prejudicial." Defense counsel then asked the State, "This is referring to [June 18], you gonna redact this?" The prosecutor responded that she believed the stolen gun referred to on the recording was the gun used in this case and that defense counsel "had these calls for months and months and months and month[s] and months and the transcripts, so if there's an objection to be made about any redactions, that could have been done a long time ago." Defense counsel stated that he did not object earlier because "[y]ou hadn't produced this to try to put it into evidence yet." Defense counsel requested that the State redact "that one line" from the recording in which the appellant's mother stated, "What you expect with a stolen gun and all that, Mark?" However, the State refused, stating that "the Court specifically asked you two weeks ago if you wanted any redactions" and that, in any event, "I'm not sure how I could do it with this witness on the stand."

The trial court held that "[i]t's way too late in the game to start trying to redact stuff" and overruled the Appellant's objection. When Franklin's direct examination resumed, the State read, without any objection from the Appellant, the following stipulation to the jury:

> Davidson County Sheriff's Office custodian, Thomas Devan Franklin, has testified regarding procurement of jail calls . . . belonging to [the Appellant]. Specific statements of these calls have been redacted and placed onto a separate CD . . . for presentation in court, the pertinent portions of the [aforementioned] calls. All parties agree that said redactions are authentic and admissible as substantive evidence for your consideration.

The State then clarified that "[i]t's just . . . the actual CD that was pulled by the Sheriff's Department" and played the recorded telephone calls for the jury. During the first call, the Appellant's mother asked him, "What you expect with a stolen gun and all that, Mark?"

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Irrelevant evidence is not admissible. Tenn. R. Evid. 402. Generally, evidence of other bad acts is irrelevant and, therefore, inadmissible. See Tenn. R. Evid. 404(b).

Here, the State's own witnesses testified that no gun related to the July 22 incident was ever found. Moreover, the State told the trial court during Waters' testimony that it did not want to "get into" the June 18 incident involving the stolen gun but then included the statement about the stolen gun on the recording. When the State sought to admit the recording, the Appellant made a contemporaneous objection. See Tenn. R. Evid. 103(a)(1). Thus, the trial court should have addressed the relevance of the statement and ruled that the gun was irrelevant because it related to the June 18 incident. Additionally, we fail to see how the State's having to redact one sentence from the recording would have caused a hardship for the State or an unreasonable delay in the trial. Accordingly, we conclude that the trial court erred by not ordering the State to redact the Appellant's mother's statement from the recording.

Next, we must determine the effect of the error, specifically whether it "'more probably than not affected the judgment or would result in prejudice to the judicial process.'" State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008) (quoting Tenn. R. App. P. 36(b)). The record reflects that Waters and K.W. both testified that the Appellant had a gun on July 22. Moreover, when the Appellant entered Centerstone, he conspicuously lifted his shirt and hands, without being prompted, to show that he did not bring any weapons into the facility. Finally, the defense strategically chose to allow the jury to hear and see highly prejudicial evidence regarding the Appellant's use of violence against Waters on July 23, despite his pleading guilty to domestic assault before trial.[1] Thus, when considering the whole record, we conclude that the trial court's error did not affect the outcome of the trial.

D.  Sufficiency of Indictment

_____

[1] During closing arguments, defense counsel argued that the Appellant pled guilty to the July 23 offense because he "accepted his responsibility for his wrongdoing. . . . [B]ut he vehemently and consistently denied kidnapping Ms. Waters or his children or any of the children consistently."

- 14 -

The Appellant contends that the State's failure to name the underlying felony in count eleven of the indictment, employing a firearm during the commission of a dangerous felony, voids the charge. The State argues that it was not required to specify the underlying dangerous felony in the indictment and that the indictment's reference to Tennessee Code Annotated section 39-17-1324(i), which lists the dangerous felonies, adequately notified the Appellant that he must prepare multiple defenses. The State also argues that, in any event, the indictment provided the Appellant with adequate notice because all of the proof at trial showed that the deadly weapon used to commit the especially aggravated kidnappings was a firearm; thus, especially aggravated kidnapping was disqualified from serving as the underlying felony, leaving aggravated burglary as the only possible underlying felony for employing a firearm during the commission of a dangerous felony. See Tenn. Code Ann. § 39-17-1324(c) (providing that "[a] person may not be charged with a violation of subsection (a) or (b) if possessing or employing a firearm is an essential element of the underlying dangerous felony as charged"). We conclude that the Appellant was adequately notified of the charge.

The United States and the Tennessee Constitutions require that an indictment inform the accused of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. An indictment satisfies this constitutional requirement "if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). The validity of an indictment is a question of law and, therefore, our review is de novo. Id.

It is an offense to employ a firearm during the commission of a dangerous felony or the attempt to commit a dangerous felony. Tenn. Code Ann. § 39-17-1324(b)(1), (2). The statute requires that the State include the underlying dangerous felony as a separate count in the same indictment. See Tenn. Code Ann. § 39-17-1324(d). The statute is silent, though, as to whether the State must name the underlying dangerous felony in the count charging a violation of Tennessee Code Annotated section 39-17-1324.

In this case, count eleven of the indictment alleged that the Appellant "did knowingly employ a firearm **during the commission of or attempt to commit a dangerous felony** as defined in Tennessee Code Annotated § 39-17-1324(i), in violation of Tennessee Code Annotated § 39-17-1324(b), and against the peace and dignity of the State of Tennessee." It did not name the underlying felony. Aggravated burglary, charged in count three, and especially aggravated kidnapping, charged in counts six through ten, are both dangerous felonies. See Tenn. Code Ann. § 39-17-1324(i)(1)(E), (H).

- 15 -

Recently, our supreme court addressed whether the State must name the underlying felony in the charge for employing a firearm during the commission of a dangerous felony in order for the defendant to receive adequate notice of the offense. In State v. Willie Duncan, the defendant was indicted for especially aggravated kidnapping with a "deadly weapon" in count one, especially aggravated robbery in count two, aggravated robbery in count three, aggravated burglary in count four, and employing a firearm during the commission of a dangerous felony in count five. See ___ S.W.3d ___, No. W2013-02554-SC-R3-CD, 2016 WL 6024007, at *1 (Tenn. Oct. 14, 2016). As in the instant case, each offense appeared on a separate page of the indictment, the especially aggravated kidnapping count and the aggravated burglary count both qualified as dangerous felonies, and the indictment did not name the underlying felony for the count of employing a firearm during the commission of a dangerous felony. Id.

The State argued that the indictment was not fatally defective because "it would have been clear to the defendant from reading the indictment as a whole that the State intended to present proof that the deadly weapon used by the defendant [during the especially aggravated kidnapping] was a firearm." Id. at *6. Thus, especially aggravated kidnapping could not serve as the underlying felony pursuant to Tennessee Code Annotated section 39-17-1324(c), leaving aggravated burglary as the only possible underlying felony. See id. at *6. However, our supreme court rejected that argument because, like the counts in the indictment for especially aggravated kidnapping in the instant case, the especially aggravated kidnapping count did not mention a firearm as the deadly weapon. Id. The court also held that evidence later introduced at trial could not be used to determine at the time of the indictment which felony would be disqualified as being the dangerous felony under section 39-17-1324(c). Id.

Nevertheless, the court went on to hold that while the "best practice" was for the State to name the underlying felony in the indictment, it was not required to do so as long as the entire indictment "sufficiently apprised the defendant of the nature and cause of the accusation against him and enabled him to adequately prepare a defense to the charge." Id. at *1, 9 n.13. The court explained as follows:

> Here, under Section 39-17-1324(d), the predicate dangerous felony must be tried in the same trial as the firearm charge, so the defendant will not be surprised at having to make a defense against either of the two possible predicate felonies. The fact that the indictment does not say which of the two possible predicate felonies will be used to prove the "dangerous felony" element of the firearm offense does not mean that the indictment falls below the minimum required to

meet the constitutional mandate of apprising the defendant of the nature and cause of the accusation against him.

Under the circumstances of this case, we hold that Count 5 of the indictment charging the defendant with employing a firearm during the commission of a dangerous felony sufficiently apprised the defendant of the nature and cause of the accusation against him and enabled him to adequately prepare a defense to the charge. Therefore, we reverse the Court of Criminal Appeals' decision to reverse the conviction and dismiss the indictment for employing a firearm during the commission of a dangerous felony.

Id. at *9.

We find Duncan dispositive of the case before us. The Appellant was indicted for multiple counts of especially aggravated kidnapping and one count of aggravated burglary. Although the count in the indictment for employing a firearm during the commission of a dangerous felony did not state the underlying felony, the Appellant knew that the possible underlying dangerous felonies were to be tried in the same trial as the firearm charge. Therefore, as in Duncan, he was not surprised at having to make a defense against the possible underlying felonies of especially aggravated kidnapping and aggravated burglary. Accordingly, he is not entitled to relief.

E. Jury Instructions

In a related argument, the Appellant claims that the trial court improperly instructed the jury that in order to find him guilty of employing a firearm during the commission of a dangerous felony, it had to find him guilty of aggravated burglary. According to the Appellant, "it was misleading and error for the trial court to arbitrarily choose aggravated burglary over especially aggravated kidnapping when charging the jury as to the elements of [Tennessee Code Annotated section 39-17-1324]." We find no merit to this claim.

During the trial court's jury instruction on employing a firearm during the commission of a dangerous felony, the court stated as follows:

For you to find [the Appellant] guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements: (1) that he employed a firearm; and (2) that the employment was during

- 17 -

the commission of or an attempt to commit an Aggravated Burglary and (3) that he acted either intentionally or knowingly.

Although our supreme court in Duncan found that the indictment provided adequate notice to the defendant, the court ultimately reversed his conviction of employing a firearm during the commission of a dangerous felony because the trial court erroneously instructed the jury that especially aggravated kidnapping could serve as the underlying felony. Id. at *10. Like Duncan, the proof at trial in this case showed that the deadly weapon used to commit the especially aggravated kidnappings was a firearm. Thus, Tennessee Code Annotated section 39-17-1324(c) prohibited especially aggravated kidnapping from serving as the underlying felony, and the trial court properly instructed the jury.

## F. Excessive Sentences

Finally, the Appellant contends that his sentences are excessive. The State argues that the trial court properly sentenced the Appellant. We agree with the State.

At the Appellant's sentencing hearing, the State introduced the Appellant's presentence report into evidence.[2] According to the report, the then thirty-five-year-old Appellant was associated with the Crips gang and dropped out of high school but obtained his GED. The report showed that the Appellant had one daughter, K.H., but did not mention M.M. or M.W. In the report, the Appellant stated that he began working in Nashville as a laborer in February 2001, but he did not provide any other information about his employment or health. The report listed prior misdemeanor convictions of drug possession, theft, criminal impersonation, and contributing to the delinquency of a minor and reflected that the Appellant violated sentences of probation. In addition to the presentence report, the State introduced into evidence certified judgments showing eight felony convictions of attempted second degree murder, a Class B felony; robbery, a Class C felony; reckless endangerment, a Class D felony; evading arrest, a Class D; being a felon in possession of a weapon, a Class D felony; two counts of being a felon in possession of a weapon, a Class E felony; and possession of marijuana for resale, a Class E felony. The State also introduced into evidence documentation of a guilty plea in federal court to conspiracy to defraud the United States for which the Appellant received a sentence of thirty-seven months in confinement.

---

[2]At the beginning of the hearing, the trial court noted that Waters "had testified" and asked if the State was going to present any other proof. However, Waters' sentencing hearing testimony is not in the record on appeal.

- 18 -

The trial court applied the following enhancement factors to the Appellant's sentences: (1), that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," and (10), that "[t]he defendant had no hesitation about committing a crime when the risk to human life was high." Tenn. Code Ann. § 40-35-114(1), (10). The court stated that it did not find any mitigating factors applicable and that it was not going to consider the Appellant's federal conviction in determining his range of punishment because "it's impossible to say . . . how this conspiracy to defraud fits into our scheme of things." The court sentenced the Appellant as a Range II, violent offender to forty years, the maximum punishment in the range, for each especially aggravated kidnapping, a Class A felony; as a Range III, persistent offender to fifteen years, the maximum punishment in the range, for aggravated burglary, a Class C felony; as a Range III, persistent offender to fifteen years, the maximum punishment in the range, at 100% for employing a firearm during the commission of a dangerous felony, a Class C felony; and to eleven months, twenty-nine days for the July 23 domestic assault, a Class A misdemeanor. The trial court ordered that the Appellant serve the forty-year sentences concurrently with each other, that the two fifteen-year sentences be served consecutively to each other and the forty-year sentences,[3] and that he serve the misdemeanor sentence concurrently for a total effective sentence of seventy years in confinement.

The length, range, and manner of service of a sentence imposed by the trial court are to be reviewed under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing). In sentencing a defendant, the trial court shall consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the Appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

---

[3]The Appellant was required to serve the fifteen-year sentence for employing a firearm consecutively to the fifteen-year sentence for aggravated burglary pursuant to Tennessee Code Annotated section 39-17-1324(e)(1).

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

First, the Appellant contends that the trial court applied three enhancement factors, (1), (9), and (10), and that the court's application of factor (9), that "[t]he defendant possessed or employed a firearm . . . or other deadly weapon during the commission of the offense," was improper. Tenn. Code Ann. § 40-35-114(9). The Appellant is referring to the trial court's stating during its pronouncement of enhancement factors, "The defendant had no hesitation about committing a crime when the risk to human life was high, meaning that he kidnapped them, he had a deadly weapon." In our view, the trial court's statement was an application of factor (10), not (9). That said, the trial court could not apply enhancement factor (10) to the sentences for especially aggravated kidnapping in this case because "there is necessarily a risk to human life and the great potential for bodily injury whenever a deadly weapon is used." State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995). Regardless, as our supreme court has explained, a trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed. . . . So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court

within the appropriate range should be upheld." Bise, 380 S.W.3d at 706. Here, the Appellant had prior misdemeanor convictions, in addition to the prior felonies, to support the trial court's application of enhancement factor (1). Therefore, we conclude that the trial court did not abuse its discretion in determining the length of the Appellant's sentences.

Next, the Appellant contends that the trial court erred by finding that he was required to serve a minimum ten-year sentence for employing a firearm during the commission of a dangerous felony because a bifurcated hearing in which the jury concluded that he had a prior qualifying felony did not occur. The State argues that the Appellant conceded he had prior dangerous felony convictions and, therefore, waived this issue.

During sentencing, the trial court stated, "I'm gonna sentence the defendant to 15 years on the [possession of a firearm during the commission of a dangerous felony], that by operation of law is at a hundred percent[.]" On the judgment of conviction form, the court wrote that the convicted offense was employing a firearm during the commission of a dangerous felony "with priors" and that the Appellant's sentence was fifteen years with a mandatory minimum sentence of ten years pursuant to Tennessee Code Annotated section 39-17-1324.

Tennessee Code Annotated section 39-17-1324(h)(2) provides that the offense is "a Class C felony, punishable by a mandatory minimum ten-year sentence . . . if the defendant, at the time of the offense, had a prior felony conviction." If the defendant does not have a prior felony conviction, the offense is "a Class C felony, punishable by a mandatory minimum six-year sentence." Tenn. Code Ann. § 39-17-1324(h)(1). Tennessee Code Annotated section 39-17-1324(f) requires a bifurcated hearing and a jury determination as to the prior felony conviction. If the prior conviction is employing a firearm during the commission of a dangerous felony, the defendant must serve 100% of the sentence. Tenn. Code Ann. section 39-17-1324(j).

No bifurcated hearing or jury determination regarding the Appellant's prior felony convictions occurred in this case. Moreover, nothing indicates that the Appellant personally waived his right to have a jury determine the existence of prior convictions. See State v. Ellis, 953 S.W.2d 216, 221-22 (Tenn. Crim. App. 1997) (stating that "in order for a criminal defendant to effectively waive his right to a jury trial, he must first be advised by the court of his right to a jury trial, and then, must personally waive the right in open court for the record"); State v. Christopher Hammack, No. M2015-00898-CCA-R3-CD, 2016 WL 1270313, at *6-7 (Tenn. Crim. App. at Nashville, Mar. 31, 2016). In any event, the Appellant does not dispute that he was a Range III, persistent offender for the offense. As such, his range of punishment was ten to fifteen years for the crime, a

Class C felony.  See Tenn. Code Ann. § 40-35-112(c)(3).  The trial court properly ordered that the Appellant serve fifteen years but could not order that he serve a minimum ten-year sentence at 100% pursuant to Tennessee Code Annotated sections 39-17-1324(h)(2) and (j).  Instead, the Appellant must serve his fifteen-year sentence at forty-five percent, the release eligibility for a persistent offender.  See Tenn. Code Ann. § 40-35-501(e).

Finally, regarding consecutive sentencing, the Appellant contends that the trial court erred by ordering that his sentence for aggravated burglary be served consecutively to his sentences for especially aggravated kidnapping based upon his extensive criminal record.  The trial court stated that consecutive sentencing was appropriate because "there's no question that he has an extensive criminal record. . . . [H]e's actually had what nine prior felony convictions?"  See Tenn. Code Ann. § 40-35-115(b)(2).  The Appellant argues that because the trial court had already used his felony convictions to determine his sentencing ranges and enhance his sentences within the ranges, the court could not use the nine felony convictions to order consecutive sentencing.  However, our Sentencing Act does not prohibit using the same facts and circumstances to enhance sentences and to impose consecutive sentencing.  State v. Meeks, 867 S.W.2d 361, 377 (Tenn. Crim. App. 1993).  Regardless, in addition to the prior felonies, the Appellant also had prior misdemeanor convictions.  Thus, we conclude that the trial court did not err by ordering consecutive sentencing.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court as modified.  The case is remanded to the trial court for correction of the judgment in count eleven,[4] possession of a weapon during the commission of a dangerous felony, to remove "with priors" and to modify the mandatory minimum sentence of ten years to six years pursuant to Tennessee Code Annotated section 39-17-1324(h)(1).  The trial court also is to correct the judgment in count twelve,[5] the domestic assault of Waters, to reflect that the Appellant pled guilty, not that he was found guilty by a jury.

_____
NORMA MCGEE OGLE, JUDGE

---

[4] Indictment count eleven was renumbered as count seven for trial, but the judgment form reflects count eleven.

[5] Indictment count twelve was renumbered as count nine for trial, but the judgment form reflects count twelve.